United States District Court
Southern District of New York

| | |
|---|---|
| Twelve Inches Around Corp.,<br>                    Plaintiff<br><br>v.<br><br>Cisco Systems, Inc.,<br>Cisco Technology, Inc.,<br>Fenwick & West LLP<br>                    Defendants | **Civil Action 08 CV 6896**<br>**ECF CASE**<br><br>**COMPLAINT FOR VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT,** *ETC.*<br><br>**JURY DEMANDED** |

Plaintiff Twelve Inches Around Corp. ("TIA") alleges as follows:

## SUMMARY

1. In 2007, TIA started a Web site called "Rent A Cert," designed to help people with popular information technology certifications find companies looking to make use of people with such certifications. Individuals with certifications by defendant Cisco Systems, Inc. (collectively with Cisco Technology, Inc., "CISCO") were among those brokered by Rent A Cert.

2. CISCO, with the help of its law firm, Fenwick & West, LLP ("FENWICK") set itself on an aggressive and reckless path to cause Rent A Cert to cease operations. This included sending the Web host of Rent A Cert (an Internet Service Provider herein referred to as "ISP") a notification known commonly as a "DMCA Removal Request," (Digital Millennium Copyright Act of 1998) which requires said ISP to take down the Web site complained of. (See Exhibit "A")

3. The DMCA Removal Request stated that Rent A Cert was infringing on CISCO's trademarks, and additionally that TIA was "committing fraud" and was "unlawful" for its Rent A Cert site, claims later reiterated by FENWICK via phone.

4. TIA in no way infringed on CISCO's trademarks or other intellectual property, and in no way and at no time committed, promoted, permitted, or aided in any type of fraud or otherwise unlawful activity whatsoever. CISCO's DMCA Removal Request, drafted by FENWICK, was knowingly and intentionally false and fraudulent, and was intended to unlawfully destroy Rent A Cert. As a result, Rent A Cert ceased its main operations on or about October 31st, 2008.

## PARTIES

5. TIA is a domestic corporation with headquarters in the State of New York.
6. CISCO are domestic corporations with headquarters in the State of California and offices in the State of New York. Upon belief, Cisco Technology, Inc. is a wholly-owned subsidiary of Cisco Systems, Inc.
7. FENWICK is a domestic limited liability partnership with headquarters in the State of California.

## JURISDICTION AND VENUE

8. Jurisdiction is conferred upon this Court by the nature of it being a federal question related to 17 USC § 512 and others, and additionally 28 USC § 1332 grants jurisdiction as the controversy exceeds $75,000 and the plaintiff and all defendants are citizens of different states.
9. The Southern District of New York is an appropriate venue as defendant CISCO maintains offices within the District, as does the plaintiff, and additionally is a where substantial part of the events giving rise to the claim occurred, all in accordance with 28 USC § 1391.

## JURY DEMAND

10. TIA demands a trial by jury.

**FACTUAL ALLEGATIONS**

11. CISCO manufactures computer networking equipment. They also operate a certification program, in which individuals that possess the skills required to design and maintain computer networks with their equipment take examinations and, upon successful completion, are given titles such as "Cisco Certified Network Professional."
12. CISCO offers incentives to its customers if they hire staff that hold CISCO's certifications. As a result of companies seeking said incentives, and because of the general demand for IT staff, many companies are seeking to obtain additional Cisco certified staff.
13. On or about September 21st, 2007, TIA started a Web site called "Rent A Cert" at the Web address: http://www.rentacert.com.
14. The purpose of this Web site was to help people with popular information technology certifications find companies looking to make use of people with such certifications, including CISCO certifications, in exchange for a commission.
15. Within one week, Rent A Cert received significant Internet publicity and began to receive a large number of daily visitors, along with requests for its services.
16. Such publicity was further fueled by the fact that a CISCO "PR Manager" publicly commented that "Cisco Cert holders have the right to market themselves and create job opportunities in pretty much whatever manner they wish."
17. Though suggesting limitations, this comment by CISCO essentially was taken by both Rent A Cert and its customers and potential customer as official acknowledgment by Cisco that the Rent A Cert program did not intrinsically violate its certification or partner agreements.
18. Until about October 30th, 2007, TIA had not had any direct communication with CISCO or its agents regarding its service.
19. FENWICK is a law firm specializing in intellectual property matters, and, upon belief, is or was retained by CISCO.
20. FENWICK at all times relevant was acting as an agent of CISCO, as it even stated in its DMCA notification letter to the ISP. (See Exhibit "A")

21. On or about October 30th, 2007, TIA received a letter, by e-mail, from FENWICK on behalf of CISCO, stating that the Rent A Cert Web site was infringing on several of its trademarks. Additionally, the letter stated that Rent A Cert's "activities are considered to be a form of legal fraud."

22. Further, the letter requested that TIA immediately take down any mention of its trademarks on any TIA Web site, and it additionally demanded that TIA provide it "with the nanes of all … certified individuals and companies who have used [TIA's] services."

23. Also on or about October 30th, 2007, FENWICK, on behalf of CISCO, sent a DMCA (Digital Millennium Copyright Act of 1998) Removal Notice as described by 17 USC § 512(c)(3), demanding that TIA's ISP take down the Rent A Cert Web site.

24. This notice cited that the Rent A Cert Web site was infringing CISCO's trademarks, and additionally repeatedly mentioned that Rent A Cert is "committing fraud." The letter also stated that it was "affirm[ed] under penalty of perjury."

25. It should be noted that when an ISP receives a DMCA Removal Notice, they must immediately act on it, with no way to appeal or give value judgment to such a notice, in order to avoid liability. TIA's ISP had no choice, and complied with the request by taking the Rent A Cert site down. In order to do this, the ISP had to take down an entire Web server which resulted in many sites unrelated to Rent A Cert, including other TIA sites, being taken off line temporarily.

26. On or about October 31st, 2007, TIA's President called FENWICK to discuss the issue. FENWICK confirmed that they had, on CISCO's behalf, sent a letter to TIA's ISP which constituted a DMCA removal request, and explained that as a result, they expected TIA's ISP was legally required to take down TIA's site.

27. During that call, FENWICK insisted that TIA was committing fraud and would be the subject of a lawsuit if it did not immediately cease operations. FENWICK additionally reaffirmed its demand that TIA turn over its entire customer list.

28. The President of TIA, at the time, held several Cisco certifications. During the phone calls between TIA and FENWICK, FENWICK threatened that CISCO would revoke his certifications if he did not comply with their demands. A revocation of his certification would have serious financial and career implications, as most of his

income was derived from IT consulting, and his certifications help to attract his clients.

29. CISCO's claim of trademark infringement arises out of a simple mention of the certification names on the Rent A Cert Web site, which clearly constitutes fair use. Rent A Cert in no way attempted to confuse, mislead or deceive its customers into thinking it was associated with Cisco or any other company, and no reasonable person would have drawn such a conclusion.

30. Every page on the Rent A Cert Web site makes (and at all times made, or made similarly) the following statement:

> "Microsoft" and "Cisco" are registered trademarks of Microsoft Corp. and Cisco Systems, Inc., respectively. "CCNA," "CCNP," and "CCIE" are registered trademarks of Cisco Systems, Inc. "MCSE" and other certification titles may be marks of their respective owners. This site is not made nor endorsed by either Microsoft or Cisco.

31. Prominent (near the beginning) in Rent A Cert's Terms of Service, which all customers must agree to, is a section titled "No Relationship With Certifications or Vendors," and details explicitly and in plain language that Rent A Cert has no affiliation with Cisco.

32. CISCO's claim of fraud appears to arise from its claim that Rent A Cert helps individuals and companies break its certification and partner agreements. Rent A Cert made sincere efforts to ensure that its service worked within the guidelines of all agreements that its customers had with CISCO and other vendors, and explicitly prohibits its customers from breaking their agreements with those vendors. In all communications with its customers, Rent A Cert made no attempt to assist anyone in breaking their agreements.

33. TIA asked CISCO, via FENWICK, to clarify what agreement terms TIA might be assisting its customers in breaking. CISCO refused to provide TIA with any agreements or sections of agreements, leaving TIA to essentially "take their word for it" that Rent A Cert may lead to the breaking of certification and partnership agreements.

34. Further, CISCO's earlier comment by its PR Manager stated that Rent A Cert could operate without violating CISCO's agreements so long as the companies and individuals took care to maintain their agreements.
35. Still today, TIA has never seen an agreement that its services would supposedly assist in breaking.
36. On or about October 31st, 2007, Rent A Cert decided to remove the core component of its Web site (the certification brokering program) in order to avoid litigation and retaliation against its President, and preserve its relationship with its Web host, while it considered its options.
37. In the just over 1 month that Rent A Cert was fully online, over 300 people and companies registered with Rent A Cert, requesting its services. Indeed, Rent A Cert had over 5,000 visitors in its first month of operation.
38. Rent A Cert is still popular, and in fact, despite posting a notice on the Web site stating that the certification brokering program is no longer available, and discontinuing all promotion and marketing of the Web site, Rent A Cert still has received about 100 phone calls and e-mails by individuals and companies requesting its services.
39. During the month prior to filing this suit (July 2008), there were still over 1,000 visitors to the Rent A Cert site, again, still in its defunct form, and still with no promotion or marketing.
40. Based on contact volume and number of visitors to its Web site, TIA estimates that by this time, it would have anywhere from 100 to 500 paid subscriptions, profiting about $35 - $145 per month each. Taking the average profit per subscription, 100 subscriptions would produce annual profits of $108,000 per year, and 500 paid subscriptions would bring $540,000 per year.
41. Besides its base service, Rent A Cert would have brought additional revenue. The database of certified individuals and companies looking to hire certified individuals could be used for full-time recruiting purposes, which in the tech world can see typical commissions over $20,000 per successful lead. The database could also be used for direct marketing, as IT professionals are a highly sought after demographic. Lastly, TIA also could have generated revenue through advertising on the Rent A

Cert Web site, similarly because it has the sought after demographic. TIA estimates that this additional revenue would have brought between $200,000 and $500,000 per year.

42. A common valuation method for a company is an amount equal to between seven and twelve times annual profit. Using this method with the above estimates, Rent A Cert was worth between $2,156,000 to over $10,000,000 before it was knowingly, intentionally, unlawfully sabotaged by CISCO with the knowing, intentional, and unlawful help of FENWICK.

43. CISCO, as a Fortune 100 company with its own in-house legal department and the virtually unlimited amount of legal advice it could afford to purchase, understood, or should have understood, that there was no fraud nor trademark infringement, and that claiming otherwise is illegal.

44. FENWICK, as an established and relatively large IP law firm, understood, or should have understood, that use of the DMCA where there is no allegation or evidence of copyright infringement is gross misuse of of thee DMCA statute and illegal as well.

45. Under 17 USC 512 (f), titled "Misrepresentations," stipulates that "Any person who knowingly materially misrepresents under this section- (1) that the material or activity is infringing, or (2) that the material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it."

46. As FENWICK understood, or should have understood, specifically since it states on its Web site that it is a "(n)ational law firm that provides comprehensive legal services to technology and life sciences clients of national and international prominence...over 275 attorneys, with offices in Silicon Valley, San Fransisco, Seattle and Boise." It should be noted that FENWICK also has offices in China, Europe, India and Israel. As the letters it wrote contained significant false content, they share liability for the content of the letters along with CISCO.

47. CISCO, in authorizing FENWICK as its agent and, upon belief, directing it to take action against TIA, shares liability for the content of those letters along with FENWICK.

## CLAIMS FOR RELIEF

### Misrepresentation under 17 USC § 512(c)(3)

48. The letter that FENWICK, on behalf of CISCO, sent to the ISP constituted a misrepresentation as described by 17 USC § 512(c)(3).
49. This misrepresentation was made knowingly and willfully by both FENWICK and CISCO.

### Libel

50. The letter that FENWICK, on behalf of CISCO, sent to the ISP constituted libel.
51. This libel was made knowingly and willfully by both FENWICK and CISCO.

### Fraud

52. The letter that FENWICK, on behalf of CISCO, sent to the ISP constituted fraud, as it was an attempt to get financial gain by deceit.
53. This fraud was made knowingly and willfully by both FENWICK and CISCO.

### Unfair Business Practices – NY GBL § 349

54. The letter that FENWICK, on behalf of CISCO, sent to the ISP constituted unfair business practices as defined by NY GBL § 349.
55. The threat to revoke the certifications of an officer of TIA constituted unfair business practices as defined by NY GBL § 349.
56. These unfair business practices were made knowingly and willfully.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays for judgment against the Defendants as follows:

a. Actual damages in the amount of $5,000,000.00 (five *million US dollars*)

b. Punitive damages in the amount of $15,000,000.00 (fifteen *million US dollars*)

c. Reasonable attorney's fees and expenses as the court may allow as set forth in 17 USC § 505.

d. The cost of the action

e. Any other damages as the court deems appropriate

Respectfully submitted this 31st day of July, 2008,

[signed]

Richard D. Borzouye, Esquire
Bar Code (RB3461)
Borzouye Law Offices
11 West 42nd Street, Suite 900
New York NY 10036
Phone: 212.938.1200
FAX:   212.768.2766
E-mail:attorneyborzouye@gmail.com

**FENWICK & WEST LLP**

SILICON VALLEY CENTER   801 CALIFORNIA STREET   MOUNTAIN VIEW, CA 94041
TEL 650.988.8500   FAX 650.938.5200   WWW.FENWICK.COM

October 30, 2007

HOANG-CHI TRUONG

EMAIL HTRUONG@FENWICK.COM
DIRECT DIAL (650) 335-7157

**URGENT**

**Via E-mail (abuse@hopone.net)**
Confirmation Copy via Federal Express

Legal Department
HopOne Internet Corporation
#1400 – 700 West Pender
Vancouver, BC V6C 1G8

    Re:    Infringement of Cisco's Intellectual Property

Dear Sirs:

    This law firm represents Cisco Systems, Inc. and its subsidiary Cisco Technology, Inc. (collectively "Cisco") in intellectual property matters. We write to request swift action about an urgent legal matter.

    Cisco has recently learned that your company hosts a website at <rentacert.com> that has posted unauthorized uses of Cisco's federally registered CCNA, CCNP, and CCIE trademarks. The owner of the site is committing fraud by brokering individuals who are CCNA, CCNP, and CCIE certified to third-party companies so the companies can attain higher partnership levels and corresponding product discounts, in contravention of Cisco certification and partnership agreements. Accordingly, we must demand that you take down the website at <rentacert.com> as soon as possible.

    To expedite the violating content's removal, we provide relevant information below.

    I hereby state and affirm, under penalty of perjury that:

    1.    The trademarks at issue are CCNA, CCNP, and CCIE, for which Cisco owns the following, multiple U.S. Trademark Registrations: 2,446,891, 2,449,787, 2,5325,42, 2,449,785, 2,451,648, 2,532,543, 2,453,750, 2,468,245, and 2,468,247, copies of which are enclosed herein.

    2.    The infringing domain <rentacert.com> uses the CCNA, CCNP, and CCIE marks without Cisco's authorization, which may lead consumers to believe that Cisco has sponsored or approved the site or its activities.

Legal Department
HopOne Internet Corporation
October 30, 2007
Page 2

      3.      Moreover, the website owner is committing fraud by renting out individuals who are CCNA, CCNP, and CCIE certified to third party companies, so the companies can attain higher partnership levels and corresponding product discounts, in contravention of Cisco certification and partnership agreements.

      4.      The website owner's unauthorized use of Cisco's trademarks and fraudulent activities are in violation of your Acceptable Service Use Policy Section 2.1, which prohibits the owner from using HopOne's services for unlawful purposes, and Section 5, which prohibits the owner from using third-party trademarks without authorization.

      5.      I have a good faith belief that use of the trademarks described above is not authorized by the trademark owner or its agent, nor is such use otherwise permissible under law.

      6.      I am Cisco's authorized agent in this matter.

      7.      I can be reached using the following information:

> Ms. Hoang-chi Truong, Esq.
> Fenwick & West LLP
> Silicon Valley Center
> 801 California Street
> Mountain View, CA 94041
> (650) 335-7157 phone
> (650) 938-5200 fax

      8.      To the best of my knowledge, all of the statements made above are true and correct.

This letter is not intended to constitute a full statement of all facts, rights, or claims relating to this matter, nor is it intended, nor should it be construed as a waiver, release, or relinquishment of any rights or remedies available to our client, whether legal or equitable, all of which are hereby expressly reserved.

Thank you for your prompt assistance with this urgent matter.

                              Sincerely,

                              Ms. Hoang-chi Truong

Rent A Cert, a good or bad idea for Cisco partners and cert holders? | NetworkWorld.com... Page 5 of 21

participate. While the duration of company - certified individual is limited by time and other factors as described on the Site, **this agreement shall not terminate simply because certified individual and company are no longer matched with each other.**

---

**Official Cisco response to the Rent A Cert idea:**

**Lang Tibbils** - PR Manager Corporate Communications for Cisco, provided the following response from Cisco:

The main objective of the **Rent-a-Cert** idea is to help companies (our channel partners) obtain a higher level of certification.

**Overview of the Cisco Channel Partner Program**

Given the rules and regulations that govern our **Channel Partner Program**, we see a couple of issues with the **Rent-a-Cert** idea.

1. If a channel partner hires a CCIE away from another Cisco Certified or Specialized Partner, Cisco will not count this individual toward the certification or specialization for the hiring channel partner for 12-months from the date of hire.

    This would make it tough for a CCIE to rent themselves to more than one partner over the course of a 12-month period.

Rent A Cert, a good or bad idea for Cisco partners and cert holders? NetworkWorld.com... Page 6 of 21

> We can enforce this policy, because CCIEs are identified by an individual # and we have a complete employment history in our database, including moves and changes among companies.
>
> 2. To obtain a Gold Certification the channel partner must employ 4 CCIEs and to earn Silver the requirement is 2 CCIEs.
>
>    According to our **Channel Partner Program** requirements, partners can employ full-time contractor employees, but that number cannot exceed 50% of the required number of CCIEs, meaning for Gold partners you cannot have more than two contracted CCIEs.
>
>    As part of our annual partner audit we validate the employment contracts for the required CCIEs.
>
>    Near as we can tell, the **Rent-a-Cert** idea is based on the concept that a CCIE could simply loan his/her certification number to a channel partner, but given that Cisco has a complete employment history of all CCIEs we would discover during the audit process that a CCIE was a registered employee for two companies thus making it impossible for them to qualify as a full-time contractor or employee.
>
> 3. Channel partners have 30-days to notify Cisco if they lose a CCIE and no longer employ the required number of CCIEs for their certification.

http://www.networkworld.com/community/node/19970                                8/1/2008

> Upon receipt of this notice the partner may qualify for a six month extension to replace the CCIE before losing their certification, meaning if they are Gold Certified they would move to Silver Certified and Silver to Premier.
>
> This requirement to remain compliant between annual audits makes **Rent-a-Cert** a short-term fix or expensive long-term proposition.
>
> ----
>
> **What I personally think about the Rent A Cert idea:**
>
> 1. Cisco Cert holders have the right to market themselves and create job opportunities in pretty much whatever manner they wish.
>
>    However, the **Rent A Cert** idea is penny wise and dollar foolish for the cert holder, although it may appear at first to be a great way to earn extra monthly cash from your cert.
>
>    Why?
>
>    Because it will drive down the salaries of all Cisco cert holders once Cisco partners get into the habit of **"cheaply renting"** Cisco certs.
>
> 2. Initially the **Rent A Cert** idea will appear advantageous for Cisco partners renting CCIEs on the **"cheap"**.
>
>    But where is that partner's value

proposition?

Rent A Cert touts on its home page:

## Put your idle certification to use!
## Earn money -- up to $1,200/month!
## Almost no work required!

Securing larger discounts without the **"value"** full-time CCIEs bring to customer accounts, will rapidly lead to a competitive commodity pricing situation where Cisco partner margins erode, resulting in less profitability for all Cisco partners.

---

**Related stories:**

| | |
|---|---|
| CCIE Pursuit | Rent Your Cisco Certification For Cash |
| Network World | Rented Certifications: What's That About? |

**What are your thoughts? Is Rent A Cert a good or bad idea for Cisco partners and cert holders?**

*[signature: Brad Reese]*

http://www.BradReese.Com

Brad Reese's blog   Add new comment   Email this page   Delicious
Digg   Reddit   Facebook   Permalink
Read more about:   Careers   Cisco   Data Center   LANs / WANs   Network Management   Security   SMB   Software   VoIP / Convergence   Wireless / Mobile